## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

CHIAPHUA INDUSTRIES LIMITED, a )
Limited Liability Company, organized and )
existing in Hong Kong, China, and )
GIABO APPLIANCES (SHENZHEN) CO., )
LIMITED, a division of International Quartz )
Limited and a wholly-owned Subsidiary of )
Chiaphua Industries Limited )
    )
    Plaintiffs/Counter-Defendants, )
    ) **Docket No. 3:06-CV-458**
v. ) **Jury Requested**
    )
**IDLEAIRE TECHNOLOGIES** )
**CORPORATION,** )
    )
    Defendant/Counter-Plaintiff. )

## ANSWER AND COUNTERCLAIM OF DEFENDANT IDLEAIRE TECHNOLOGIES CORPORATION

IdleAire Technologies Corporation ("IdleAire") answers the Amended Complaint as follows:

### FIRST DEFENSE

IdleAire fully performed the contract with Chiaphua Industries Limited ("CIL") The Amended Complaint fails to allege any facts that would constitute a breach of the contract between IdleAire and CIL and therefore fails to state a claim for breach of contract upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs' claims for intentional interference with contract and business relationship, common law intentional interference with contract and/or intentional interference with prospective business relationships fail to state claims upon which relief can be granted under applicable law.

## THIRD DEFENSE

Plaintiffs' civil conspiracy claim fails to state a claim upon which relief can be granted in that the Amended Complaint fails to allege a conspiracy between IdleAire and HSRT to commit an unlawful purpose, or a lawful purpose by unlawful means, upon which relief may be granted.

## FOURTH DEFENSE

Plaintiffs' claims for violation of the Tennessee Consumer Protection Act fails to state claims upon which relief can be granted under applicable law.

## FIFTH DEFENSE

CIL is estopped from asserting some or all of the claims contained in the Amended Complaint by (a) inducing IdleAire to enter into the Agreement by misrepresenting to IdleAire that CIL had the ability to perform the Agreement; (b) by misrepresenting that CIL would be the manufacturer of the Units; (c) by employing fraud and deceptive practices in negotiating the price for the Units; (d) by a partial failure of the consideration for the Agreement in respect of the foregoing; (e) by CIL's prior breach of the Agreement, consisting of assigning or subcontracting performance of the Agreement to one or more third parties without IdleAire's knowledge or consent; (f) by refusing to return to IdleAire the tooling necessary for the manufacture of the Units in violation of the Agreement; (g) by disclosing IdleAire's proprietary information without the consent of IdleAire; (h) by violating its duty of good faith and fair dealing implied in the Agreement; (i) in response to IdleAire's request for a reduction of the unit price of the Units in the spring/summer of 2005, by seeking instead to increase the price of the Units on the basis of misrepsentations concerning its costs of producing the Units; and (j) by intentionally and maliciously interfering with the contract relations between IdleAire and HSRT.

## SIXTH DEFENSE

In the negotiations preceding execution of the Agreement, CIL fraudulently misrepresented material facts concerning the production of the Units and its cost of performing the Agreement. These misrepresentations included, without limitation, the

representation that CIL would be the manufacturer of the Units; that $495 per Unit was the lowest price CIL could charge IdleAire and produce the Units at an acceptable level of profit; and by concealing the fact that the "best" price it was willing to quote IdleAire included a mark-up to cover the profit and overhead of an undisclosed party to whom CIL planned to subcontract performance of the Agreement.

## SEVENTH DEFENSE

The Agreement was a non-exclusive supply contract that did not guarantee CIL the production of a minimum number of Units nor preclude IdleAire at any time from contracting with a third party for the production of the Units.

## EIGHTH DEFENSE

CIL's interference with the contract between IdleAire and HSRT constitutes unlawful efforts to (a) regulate the cost of goods purchased by IdleAire from HSRT or from CIL; and (b) restrict IdleAire's importation of goods into the state of Tennessee, all in violation of Tenn. Code Ann. § 47-25-101.

## NINTH DEFENSE

All actions taken by IdleAire in contracting with HSRT for production of the Units and in terminating the Agreement were taken in good faith and in furtherance of IdleAire's ecnomomic interests.

## TENTH DEFENSE

CIL suffered no damages as a result of any of the wrongful conduct on ths part of IdleAire that is alleged in the Amended Complaint.

## ELEVENTH DEFENSE

The only business relationship CIL has ever had, or planned, with HSRT consisted of the wrongful assignment or subcontracting of the performance of the Agreement between CIL and IdleAire. Inasmuch as CIL had no right to expect any order from IdleAire beyond the 5,120 Units covered by IdleAire Purchase Order 003741, CIL had no reasonable expectation of additional business with HSRT that IdleAire's conduct could have interfered with.

## TWELFTH DEFENSE

Following IdleAire's termination of the Agreement, CIL unlawfully threatened to use its influence in Beijing to achieve its objectives and to take action to injure IdleAire's reputation and standing to do business in the United States and foreign countries, all in an effort to induce IdleAire to terminate its contract with HSRT and place orders for more Units with CIL.

## THIRTEENTH DEFENSE

In response to the numbered paragraphs of the Amended Complaint, Defendant answers as follows:

1. Paragraph 1 is admitted upon information and belief.

2. IdleAire is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2.

3. Paragraph 3 is Admitted

4. Paragraph 4 is Admitted.

5. IdleAire is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5.

### Facts

6. With respect to paragraph 6, IdleAire admits that CIL and IdleAire are parties to a Manufacturing and Sales Agreement dated April 2, 2004 (the "Agreement"), and that Exhibit A to the Amended Complaint is a copy of the Agreement.

7. Paragraph 7 is confusing, but IdleAire admits that the Agreement is a non-exclusive supply contract and that it requires CIL to manufacture Units in accordance with product specifications and other requirements incorporated into the Agreement. IdleAire would submit that the express terms of the Agreement speak for themselves.

8. Paragraph 8 is denied.

9. Paragraph 9 is denied.

10.    IdleAire admits that CIL executed a Confidentiality, Non-Disclosure and Non-Circumvention Agreement dated September 10, 2003 (the "NDA") and that Exhibit B to the Amended Complaint is a copy of the NDA. IdleAire would submit that the express terms of the NDA speak for themselves.

11.    With regard to paragraph 11, the NDA is a unilateral agreement IdleAire required CIL to sign before having access to IdleAire's confidential and proprietary information. CIL never requested IdleAire to sign a non-disclosure or confidentiality agreement. Any information proprietary to CIL that was disclosed to IdleAire was proprietary as to matters other than the design or production of the Units.

12.    IdleAire admits that the Agreement incorporates specifications and production requirements for the Units prescribed and explained by IdleAire to CIL before and after March 12, 2004. Paragraph 12 is otherwise denied.

13.    IdleAire admits the Agreement, but does not understand the remaining allegations in paragraph 13.

14.    IdleAire is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14. IdleAire affirmatively states, however, that CIL never informed IdleAire of the existence of Giabo, a confidentiality agreement between CIL and  Zymbo or between CIL and any other party that related to the Agreement, or of an agreement for the production of the Units by anyone other than CIL.

15.    IdleAire is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 15. The remaining allegations of this paragraph are denied. For further answer, IdleAire denies that CIL was authorized to provide Zymbo with IdleAire's proprietary information as CIL's admitted disclosure of IdleAire's proprietary information to Zymbo constitutes a material breach of the NDA executed by CIL.

16.    IdleAire is without knowledge or information concerning what information CIL may have provided Zymbo, or what the intentions of those parties may

have been. However, CIL never requested IdleAire's consent to CIL assigning or subcontracting production of the Units to Zymbo, as required by the Agreement.

17.     Paragraph 17 is denied.

18.     IdleAire is without knowledge or information sufficient to form a belief as to the truth of paragraph 18. Although CIL was aware of IdleAire's requirement that it deal directly with the manufacturer and further that the Agreement was not assignable, CIL failed to disclose to IdleAire that CIL, much less its then unknown subsidiary, Giabo planned to or had entered into a memorandum of understanding and contract with Zymbo (the "Zymbo Memo").

19.     IdleAire is without knowledge or information sufficient to form a belief as to the truth of paragraph 19.

20.     With respect to paragraph 20, IdleAire denies that CIL had any right under the Agreement to subcontract any of the work to Zymbo or any other third party. IdleAire is otherwise without knowledge or information sufficient to form a belief as to the truth of paragraph 20.

21.     Paragraph 21 is denied.

22.     IdleAire admits that CIL secured ETL certification of the Units, but is without knowledge of information sufficient to form a belief as to the truth of the remaining allegations of paragraph 22.

23.     With respect to paragraph 23, IdleAire admits that, pursuant to the Agreement, it issued two initial purchase orders to CIL: (a) Purchase Order No. 003741, dated April 7, 2004, which called for the production of 5,120 Units at a unit price of $495, and delivery of the Units to IdleAire pursuant to individual purchase orders or releases to be issued by IdleAire from time to time during the term of the Agreement; and (b) Purchase Order No. 003743, also dated April 7, 2004, in the amount of $46,399.00, authorizing CIL to immediately manufacture the tooling that would be necessary to manufacture the Units. Paragraph 23 is otherwise denied.

24.     With respect to paragraph 24, IdleAire admits (a) that in June, 2004, Jim Hannah and Adam McCall, IdleAire's principal representatives responsible for the design and production of the Units, went to CIL facilities in Hong Kong for a meeting with CIL. While in Hong Kong CIL indicated IdleAire should visit China to meet CIL's production personnel and to tour CIL's manufacturing facilities; (b) that on June 16, 2004, CIL representatives (which Hannah and McCall do not recall included Paul Hill), accompanied by Steve Lee and Fred Durham of the John Lee Company, drove them to what Hannah and McCall had been told would be CIL's manufacturing facility; (c) that, after arriving at the facility, they observed signs with the name "Zymbo" displayed on the building and were introduced to persons working there. Paragraph 24 is otherwise denied.

25.     With respect to paragraph 25 of the Amended Complaint, IdleAire admits that, after June 16, 2004, IdleAire and CIL continued to discuss the production of the Units and that the unit price for the Units specified by the Agreement was revised. Paragraph 25 is otherwise denied.

26.     Paragraph 26 is admitted.

27.     IdleAire is without knowledge or information sufficient to form a belief as to the truth of paragraph 27.

28.     IdleAire is without knowledge or information sufficient to form a belief as to the truth of paragraph 28.

29.     Paragraph 29 is denied, and based upon what IdleAire has learned since the inception of this action, CIL was not truthful about the facts that were disclosed.

30.     Paragraph 30 is denied.

31.     With respect to paragraph 31, IdleAire denies that IdleAire visited HSRT in 2005.

32.     Paragraph 32 is a conclusion of law and therefore need be neither admitted nor denied. However, IdleAire reiterates its denial that, at the time contemplated by paragraph 32, CIL had informed it, or that IdleAire was otherwise aware, of any of the alleged agreements between or among CIL, Giabo, Zymbo and HSRT.

33.    IdleAire admits that it ultimately became aware that HSRT had manufactured certain of the Units, but denies the remaining allegations of paragraph 33.

34.    Paragraph 34 is admitted.

35.    IdleAire's May 12, 2006, letter to CIL, Exhibit E to the Amended Complaint, requested CIL to deliver the tooling IdleAire purchased under Purchase Order No. 003743 to HSRT. (In actuality, all of this tooling was in HSRT's possession.) CIL responded by denying IdleAire's ownership of the tooling and by demanding that HSRT refuse to use the tooling to produce Units directly for IdleAire. CIL's demands to HSRT inlcuded the threat to have Chinese authorities "shut down" HSRT's manufacturing facility if it used the tooling on behalf of IdleAire. In response to CIL's response, IdleAire wrote CIL on May 19, 2006, reiterating the basis of its ownership of the tooling and insisting that CIL stop asserting wrongful claims of ownership and cease threatening HSRT with reprisals if it produced Units for IdleAire. Except to the extent consistent with this explanation, paragraph 35 is denied.

36.    Paragraph 36 is admitted.

37.    Paragraph 37 is admitted.

38.    Paragraph 38 is a conclusion of law and therefore need be neither admitted nor denied. The provisions of the Agreement relating to termination of the Agreement for convenience are contained in Section 4.4 and speak for themselves. Paragraph 38 is otherwise denied.

39.    In response to paragraph 39, IdleAire admits that it contracted with HSRT in March, 2006, to manufacture the Units; that the provisions of the agreement were discussed prior to the date the agreement was signed; and that CIL's consent to these matters was not requested because CIL's consent was not required under the terms of the Agreement or otherwise. Paragraph 39 is otherwise denied.

40.    Paragraph 40 is denied.

41.    Paragraph 41 is denied.

42.    Paragraph 42 is denied.

43.     Except as qualified in the next sentence, IdleAire is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43. The only confidential or proprietary information CIL ever possessed with respect to the HVAC Units was information it had received from IdleAire.     Accordingly, any confidential or proprietary information CIL supplied HSRT relating to production of the Units would necessarily have belonged to IdleAire.

## Breach of Contract

44.     IdleAire incorporates by reference its answers to paragraphs 1 through 43 above as its answer to paragraph 44.

45.     Paragraph 45 is denied.

46.     Paragraph 46 is denied.

47.     IdleAire admits that the Agreement included, as to both parties, an implied covenant of fair dealing. The remainder of paragraph 47 is denied.

48.     Paragraph 48 is denied.

## Intentional Interference with Contact and Business Relationship

49.     IdleAire incorporates by reference its answers to paragraphs 1 through 48 above as its answer to paragraph 49.

50.     Paragraph 50 is denied.

51.     Paragraph 51 is denied.

52.     IdleAire admits purchasing Units from HSRT. Paragraph 52 is otherwise denied.

53.     Paragraph 53 is denied.

54.     Paragraph 54 is denied.

55.     Paragraph 55 is denied.

56.     Paragraph 56 is a conclusion of law and therefore need be neither admitted nor denied. However, IdleAire denies that it violated any provision of T.C.A. § 47-50-

109, or that its conduct violated the Tennessee Consumer Protection Act, assuming the Act is applicable to any issue presented by the Amended Complaint.

### Common Law Intentional Interference with Contract

57.     IdleAire incorporates by reference its answers to paragraphs 1 through 56 above as its answer to paragraph 57.

58.     Paragraph 58 is denied.

59.     Paragraph 59 is denied.

60.     IdleAire admits that it purchased Units manufactured by HSRT. Paragraph 60 is otherwise denied.

61.     Paragraph 61 is denied.

62.     Paragraph 62 is denied.

63.     Paragraph 63 is denied.

### Intentional Interference with Prospective Business Relationships

64.     IdleAire incorporates by reference its answers to paragraphs 1 through 63 above as its answer to paragraph 64.

65.     Paragraph 65 is denied.

66.     Paragraph 66, although consisting of speculation rather than allegations of fact, is denied.

67.     Paragraph 67 is denied.

68.     Paragraph 68 is denied.

### Civil Conspiracy

69.     IdleAire incorporates by reference its answers to paragraphs 1 through 68 above as its answer to paragraph 69.

70.     Paragraph 70 is denied.

71.     Paragraph 71 is denied.

72.     Paragraph 72 is denied.

73.     Paragraph 73 is denied.

## Tennessee Consumer Protection Act

74.     IdleAire incorporates by reference its answers to paragraphs 1 through 73 above as its answer to paragraph 74.

75.     Paragraph 75 is denied. CIL was not a consumer under its agreement and contract with HSRT as CIL retained HSRT to manufacture the subject HVAC product for purchase by IdleAire, who was the consumer under the Agreement.

76.     Paragraphs 76 through 79 are denied.

77.     All allegations of the Amended Complaint that have not hereinabove been either expressly admitted or denied are hereby expressly denied.

## COUNTERCLAIM

Now having fully answered, IdleAire assumes the role of Counter-Plaintiff to assert its Counterclaim against original Plaintiff and now Counter-Defendant CIL for damages. In support of its Counterclaim, IdleAire would state as follows:

### Parties:

1.     IdleAire is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 410 North Cedar Bluff Road, Suite 200, Knoxville, Tennessee 37923.

2.     CIL is a limited liability company organized and existing under the laws of Hong Kong with its address at 3/F Dai Wang Street, Tai Po Industrial Estate, Tai Po, New Territories, Hong Kong.

### Facts:

3.     At the time of the Agreement with CIL, IdleAire was a relatively new privately held company in the early stages of commercially deploying the first nationwide advanced truck stop electrification network via its "ATE—Advanced Travel Center Electrification®"system. The IdleAire ATE system uses electrical power to provide in-cab heating and air conditioning, electric shore power, communication, entertainment and education services to drivers of heavy duty class 7 and 8 diesel, long haul trucks. The

IdleAire system, which allows drivers to turn off their engines while they are parked, is being installed in commercial travel centers and other parking facilities where drivers park and idle their truck engines for extended periods.

4.      Each truck parking space served by IdleAire's ATE system includes an air conditioner unit ("HVAC") mounted on a steel truss approximately 15 feet above the ground. Parking lots served by IdleAire typically have between 50 and 100 ATE-equipped parking spaces. The original HVAC unit was specially designed for use in the IdleAire system by IdleAire and Custom Air Plenums, Morristown, Tennessee. Custom Air Plenums did not have the capacity to manufacture the Units in quantities required by IdleAire for its planned expansion at a price that would be economical in light of the retail sales price of IdleAire's service. An alternate manufacturer was therefore needed.

5.      Custom Air Plenums suggested that a Hong Kong company it generally described to IdleAire might be able to meet IdleAire's production requirements as to both volume and price, and IdleAire determined that this company was CIL.

6.      IdleAire requires each potential supplier of a product or service that will be used in the production, installtion or operation of its ATE system to sign a non-disclosure agreement in conjunction with disclosing confidential or proprietary information. IdleAire sent its Confidentiality, Non-Disclosure and Non-Circumvention Agreement (the "NDA") attached as Exhibit B to the Amended Complaint to CIL through Custom Air Plenums. Paul Hill executed the NDA on behalf of CIL on September 9, 2004 and returned it to IdleAire through Custom Air Plenums. CIL never asked IdleAire to sign a comparable non-disclosure agreement.

7.      During the first exploratory meeting between representatives of CIL and IdleAire, IdleAire informed CIL that its new HVAC supplier must (a) be the manufacturer of the Units and be willing to work directly with IdleAire's product development team in producing the Units; (b) have the quality control and production capabilities that would ensure that it could provide the level of quality and reliability required by IdleAire, and produce Units in quantities large enough to meet IdleAire's expansion plans; and (c) give IdleAire the lowest market price for the Units.

8. In response to these specific requirements, CIL assured IdleAire that a contract with CIL would accomplish all of these requirements.

9. During their initial discussions, CIL gave IdleAire examples of products which were presented as products manufactured by CIL at a small profit margin per unit.

10. Thinking it was dealing with the manufacturer, IdleAire negotiated directly with CIL in order to establish the terms of a potential business relationship between the parties for the production of the HVAC products. IdleAire did not enter into any contractual or business relationship with Lee for the manufacture of the Units.

11. Contrary to the exclusive agreement proposed by CIL, IdleAire negotiated a non-exclusive contractual agreement with CIL so that IdleAire would have the ability to freely deal with any other business competitors in the marketplace in order to obtain the most favorable prices for the HVAC products that it purchased.

12. A unit price was identified and CIL led IdleAire to believe that the quoted price for the HVAC products was the best price IdleAire could get in the marketplace.

13. On or about April 2, 2004, IdleAire and CIL entered into the Agreement, in which CIL agreed to manufacture for IdleAire, on a non-exclusive basis, the HVAC Units. The Agreement did not in any way prohibit IdleAire from negotiating or contacting with any other parties with regard to the purchase of the Units.

14. As part of the Agreement, IdleAire agreed to pay CIL to fabricate tooling necessary for the manufacture the Units.

15. The Agreement did not set forth any specific quantity of Units to be purchased by IdleAire from CIL. IdleAire was free to purchase from CIL any volume of HVAC products that it required.

16. Paragraph 4.4 of the Agreement provides, in relevant part, that: "[B]eginning twelve (12) months from the Effective date of this Agreement, either IdleAire or CIL may terminate this Agreement for convenience and without cause upon the giving of one hundred and eighty (180) days notice to the other Party."

17.     Paragraph 5.10 of the Agreement provides, in relevant part, that: "[T]his Agreement may not be assigned by either party without the prior consent of the other party."

18.     IdleAire entered into the Agreement in reliance upon CIL's representations, including the representation that CIL was the manufacturer of the HVAC products purchased under the Agreement.

19.     On or about April 7, 2004, IdleAire sent to CIL a purchase order (the "Purchase Order") for the manufacture and purchase of Five Thousand One Hundred Twenty (5,120) HVAC units and a second purchase order for production of the tooling necessary to manufacture the Units under the specifications set forth in the Agreement.

20.     Under the Agreement, purchase price for the HVAC units was $495.00. In light of the representations and assurances made by CIL during the negotiation of the Agreement, IdleAire accepted $495.00 per unit as the best price it could have found. CIL in fact concealed that it had made plans to purchase the Units from a third party at a much lower price, and that the price quoted IdleAire included an allowance for overhead and profit for both CIL and this third party.

21.     On or about June 14, 2004, while in Hong Kong to meet with CIL, CIL suggested that representatives from IdleAire go to mainland China for a tour of the factory where the HVAC Units would be manufactured (the "Tour").

22.     Prior to the Tour, CIL's representatives informed representatives from IdleAire that they were going to be touring "our factory," indicating to IdleAire that the manufacturing facility to be visited was owned and operated by CIL .

23.     During the course of the Tour, representatives from IdleAire noticed a sign with the word Zymbo at the manufacturing facility. The IdleAire representatives did not understand what, if any, significance the word Zymbo had with regard to the manufacturing process.

24.     On or about July 1, 2004, IdleAire received the first shipment of HVAC products purchased from CIL under the Agreement.

25.     Even after receipt by IdleAire of the first shipment of Units, IdleAire still believed that CIL was the manufacturer of the Units. CIL concealed its agreements with Zymbo with regard to the manufacturing of the Units.

26.     Subsequently, CIL began to mention Zymbo or refer to people as being from Zymbo.

27.     Upon information and belief, Zymbo actually manufactured and shipped to IdleAire the first shipment of the HVAC products purchased by IdleAire from CIL under the Agreement.

28.     Before and after the first shipment, IdleAire experienced problems in communicating Unit design and production issues with CIL's staff. With CIL's knowledge and agreement, IdleAire engaged in direct contact with certain responsible individuals at the factory. All the while, key business personnel in CIL's company were quitting or being terminated and CIL continued to assign new personnel responsibility over the Agreement, creating additional problems.

29.     During December of 2004, CIL informed IdleAire that it was shifting the production of the HVAC products to another factory. At this time CIL gave the name "Guang Zhou Hong Shan Refrigeration Technology Fangcun District Guang Zhou China" to IdleAire. The factory contact personnel were the same as before.

30.     On or about March 3, 2005, representatives of Guang Zhou Hong Shan Refrigeration Technology Fangcun District Guang Zhou China ("HSRT") initiated contact with IdleAire and inquired whether IdleAire was interested in considering a business relationship under which HSRT would be IdleAire's HVAC supplier.

31.     As of March of 2005, CIL had not shipped to IdleAire the remaining Three Thousand Forty (3,040) units purchased by IdleAire under the Purchase Order.

32.     As part of the contact initiated in March 2005, HSRT offered to sell HVAC products to IdleAire for a price of Three Hundred Three Dollars ($303.00) per unit. This price demonstrated that the representations of CIL regarding the best price available were false and misleading. IdleAire did not pursue HSRT's March 2005 proposal.

33.     In the summer and into the fall of 2005, IdleAire, as it was doing with the suppliers of other products, requested CIL to reduce the price of the HVAC Units by ten percent (10%) as it was doing with other vendors.   CIL refused to cut the price of the HVAC products and instead informed IdleAire that it was forced to increase the price to Five Hundred Forty Dollars ($540.00) per unit because of increased costs of materials and labor.    CIL also indicated it might be unwilling to continue to manufacture the HVAC units for IdleAire.  Being faced with CIL's price increase and possible total loss of its manufacturing supplier, IdleAire informed CIL that it would be forced to look for other sources for the HVAC units.

34.     In light of CIL's initial deception in the negotiation of the Agreement, the threat of an increase in the unit price to $540 and the threatened loss of its source of supply, IdleAire determined it had no alternative but to search for another HVAC supplier.

35.     Thereafter, HSRT and IdleAire engaged in discussions regarding HSRT's interest in becoming IdleAire's HVAC supplier. On or about March 20, 2006, HSRT and IdleAire executed an agreement under which IdleAire agreed to purchase from HSRT, on a non-exclusive basis, certain HVAC products (the "HSRT Agreement").

36.     During this time period, IdleAire continued to request a reasonable price reduction from CIL for the units remaining on the Purchase Order.

37.     On or about May 12, 2006, IdleAire sent CIL a Notice of Termination of the Agreement for convenience pursuant to Paragraph 4.4 of the Agreement.

38.     In response to the notice of termination, CIL threatened to sue HSRT, to enter HSRT's plant and take its tooling for the Units, and even to seek the intervention of the Chinese government if it continued to do business with IdleAire.  CIL also began threatening IdleAire in an effort to cause IdleAire to terminate its relationship with HSRT.

39.     Notwithstanding CIL's conduct, IdleAire honored the Agreement by agreeing to accept and pay CIL for the balance of the Units covered by the purchase order.

40.     The continued delivery of HVAC Units was critical to IdleAire's expansion program. CIL was aware of this need, and refused to acknowledge IdleAire's ownership of the tooling, or the right of HSRT to use the tooling in producing Units for IdleAire.

41.     Due to CIL's wrongful interference and threats against HSRT to remove the existing tooling, IdleAire was forced to have new tooling manufactured by HSRT to permit the continuation of its work. IdleAire paid $30,000.00 for the new tooling and lost four to six weeks of manufacturing time while the tooling was being fabricated.

42.     CIL did not manufacture the HVAC units sold to IdleAire and did not give IdleAire the best possible pricing as it overcharged IdleAire based on actual profit margins of CIL and the entity to whom it improperly subcontracted the manufacturing of the HVAC units.

## Breach of Contract

43.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

44.     Sometime after CIL and IdleAire entered into the Agreement, CIL assigned certain rights and/or responsibilities under the Agreement first to its own subsidiary and then subsequently to Zymbo and HRST, all without the knowledge or consent of IdleAire. CIL failed to disclose to IdleAire the true nature of its business relationships with Giabo, Zymbo, and HSRT, and as a consequence, IdleAire did not become aware of the full extent of CIL's assignments even until the Complaint was filed in this matter.

45.     Paragraph 5.10 of the Agreement provides, in relevant part, that: "[T]his Agreement may not be assigned by either party without the prior consent of the other party."

46.     CIL's assignment of certain rights and/or responsibilities under the Agreement to its own subsidiary and subsequently to Zymbo and HRST, all without the consent of IdleAire, constitutes a material breach of the Agreement.

47. CIL materially breached the Agreement by attempting to obtain a price increase by means of deception and misrepresentation.

48. CIL also materially breached the Agreement by asserting a fraudulent claim to ownership of the tooling in HSRT's possession, which claims resulted in uncertainty on the part of HSRT as to who owned the tooling. IdleAire was thereby forced to purchase new tooling for HSRT to use in producing Units for IdleAire.

49. CIL violated its duty of good faith and fair dealing implied in the Agreement.

50. Paragraph 1 of the Confidentiality Agreement provides, in relevant part, that: "Neither prospective participant...shall distribute, disclose, or disseminate to any third party at any time any of the Proprietary Property without the express written consent of the Company [IdleAire] being first had and obtained."

51. CIL's disclosure of IdleAire's propriety information first to its own subsidiary and subsequently to Zymbo and HRST, all without the consent of IdleAire, constitutes a material breach of the Confidentiality Agreement.

52. As a result of CIL's material breaches of the Agreement and Confidentiality Agreement, IdleAire has suffered damages.

### Fraudulent Misrepresentation

53. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

54. Prior to entering into the Agreement, IdleAire informed CIL that one of its business requirements was that it deal directly with the manufacturer of the HVAC products that it sought to purchase.

55. CIL fraudulently misrepresented to IdleAire that it was the manufacturer of the HVAC products purchased under the Agreement, and/or concealed the identity of the manufacturer when it knew the information was an integral part of the consideration for the Agreement.

56. IdleAire reasonably relied on CIL's fraudulent statements or omissions that caused IdleAire to believe that CIL was the manufacturer of the HVAC products purchased under the Agreement and that IdleAire was getting the best possible pricing.

57. After executing the Agreement and having placed an order, IdleAire became aware of Zymbo and then HSRT. CIL never was the manufacturer of the HVAC units, but rather used Zymbo and HSRT to manufacture the HVAC products purchased by IdleAire under the Agreement at a price substantially less than the amount being charged to IdleAire.

58. These intentional acts by CIL directly and proximately caused injury resulting in damages to IdleAire.

### Violation of Tennessee Consumer Protection Act

59. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

60. The conduct of CIL, which occurred in part within the State of Tennessee, was wrongful, unfair, deceptive, fraudulent, intentional and as such constitutes a violation of the Tennessee Consumer Protection Act as set forth in Tenn. Code Ann. § 47-18-104.

61. IdleAire has incurred ascertainable damages by virtue of the inappropriate conduct of CIL.

62. IdleAire, by virtue of the intentional nature of CIL's inappropriate conduct, is entitled to recover treble damages and attorneys' fees pursuant to Tenn. Code Ann. § 47-18-104.

### Intentional Interference with Business Relationship

63. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

64. CIL, with knowledge of IdleAire's contractual agreement with HSRT, intentionally and maliciously interfered with the business relationship between IdleAire and HSRT.

65. Upon learning of IdleAire's contractual agreement with HSRT, CIL threatened HSRT that it would file suit against it and take away the tooling necessary for the manufacture of the HVAC products if HSRT continued any direct business relationship with IdleAire. IdleAire was forced to have the tooling remanufactured at its cost.

66. CIL repeatedly attempted to intimidate both HSRT and IdleAire with threats of legal and other action if IdleAire and HSRT continued to do business.

67. CIL acted with the intent to cause the breach or termination of IdleAire's contractual agreement with HSRT.

68. CIL attempted to interfere with IdleAire's contractual relationship with HSRT in order to cause harm and injury to IdleAire such that IdleAire would continue to utilize CIL as the manufacturer of the HVAC products.

69. These intentional acts by CIL directly and proximately caused injury resulting in damages to IdleAire.

**WHEREFORE**, premises considered, IdleAire requests as follows:

A. That CIL be required to answer this Counterclaim within the time required by law.

B. That IdleAire be granted a judgment against CIL for compensatory damages in the amount of One Million Two Hundred Thousand Dollars ($1,200,000.00) under theories of breach of contract, fraudulent misrepresentation, intentional interference with IdleAire's business relationship with HSRT, and violation of the Tennessee Consumer Protection Act.

C. That the damages awarded to IdleAire be trebled against CIL for violation of the Tennessee Consumer Protection Act.

D. That IdleAire be awarded punitive damages not to exceed One Million Dollars ($1,000,000.00).

E. That IdleAire be awarded its costs and reasonable attorneys' fees.

F.   That IdleAire have such other, further, and general relief to which it may be entitled.

G.   That a jury try this cause.

**KENNERLY, MONTGOMERY & FINLEY, P.C.**

By___ /s Jack M. Tallent, II_____
           Jack M. Tallent, II, BPR #004262
           Kevin C. Stevens, BPR #023035
           *Attorneys for IdleAire Technologies Corp.*
           4th Floor, Bank of America Center
           550 Main Street
           Knoxville, Tennessee 37902
           865/546-7311

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2007, a copy of the foregoing Answer and Counterclaim was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

**KENNERLY, MONTGOMERY & FINLEY, P.C.**

By_____ /s Jack M. Tallent, II_____
                Jack M. Tallent, II